IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **In re:  Helicopter Crash Near** | No. 09-md-2053-MO |
| **Weaverville, California 8/5/08** | Associated Matter: 09-cv-705-MO |

OPINION AND ORDER

**MOSMAN, J.,**

Insurance coverage plaintiffs Carson Helicopters, Inc. and Carson Helicopter Services, Inc. and insurance coverage defendant Houston Casualty Company filed cross-motions for partial summary judgment regarding choice of law in the coverage action within this multi-district litigation. For the reasons below, I grant in part and deny in part both parties' motions. I find that no conflict exists between Oregon and Pennsylvania's laws regarding use of extrinsic evidence in insurance contract cases. Because neither state permits extrinsic evidence to resolve an ambiguity in an insurance policy, no choice-of-law analysis is necessary. Additionally, because Oregon does not have a governmental interest in Carson's bad faith tort claim that would be impaired by the application of Pennsylvania law, I will apply Pennsylvania law to that claim.

## BACKGROUND

On August 5, 2008, a Sikorsky S-61N helicopter crashed (the "Accident") during takeoff from a remote mountain site in the Shasta-Trinity National Forest in Northern California. The helicopter was transporting ten firefighters working on the Iron 44 Fire, and three pilots were also

PAGE 1 - OPINION AND ORDER

on board. The crash claimed the lives of seven firefighters and two pilots, while the remaining

three firefighters and one pilot were severely injured. These firefighters, pilots, and

representatives have separate claims for wrongful death and personal injury as a part of this

multi-district litigation.

Carson Helicopters, Inc. ("Carson Helicopters") is a Pennsylvania corporation with its

principal place of business in Perkasie, Pennsylvania. (Pls.' Concise Statement of Facts (#270) ¶

1.) Carson Helicopter Services, Inc. ("Carson Services") is a subsidiary of Carson Helicopters

(together, they are "Carson"), organized as an Oregon corporation with its principal place of

business in Grants Pass, Oregon. Carson owned the Sikorsky S-61N helicopter involved in the

Accident. The U.S. Forest Service contracted to use the helicopter to transport firefighters, and

insurance coverage intervenor–plaintiff Columbia Helicopters, Inc. ("Columbia") performed

maintenance on the helicopter.

Insurance coverage plaintiff Carson purchased an insurance policy ("Carson–Houston

Casualty policy") from coverage defendant Houston Casualty Company ("Houston Casualty") for

the period April 1, 2008 to April 1, 2009. (Pls.' Second Am. Compl. (#144) ¶ 3.) Endorsement 8

of the policy provides, inter alia, coverage for bodily injury, including death, arising out of a

helicopter accident when the helicopter ceases to be in Carson's possession or under Carson's

control. (*Id.* at ¶ 18.) At least at the time Carson purchased the policy, it provided a $25 million

per occurrence and annual aggregate coverage limit. (*Id.*) When Carson became aware that

Houston Casualty might deny coverage under Endorsement 8, Carson filed suit in the Eastern

District of Pennsylvania for anticipatory breach of contract and a declaratory judgment. (*Id.* at ¶¶

27-28; *see also Carson Helicopters, Inc. v. Houston Cas. Co.*, No. 08-5301, 2009 WL 1688472

(E.D. Pa. June 16, 2009).) In the action before Judge Shapiro of the Eastern District of

Pennsylvania, Houston Casualty successfully argued to transfer venue pursuant to 28 U.S.C. §

1404(a). *See Carson Helicopters*, 2009 WL 1688472, at *3 (analyzing venue under *Jumara v.

State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995).)

Soon after Carson filed its initial complaint against Houston Casualty in Pennsylvania,

Columbia filed a separate lawsuit against Carson in this district, alleging Carson was obligated to

defend Columbia against the wrongful death and personal injury lawsuits. *See Columbia*

*Helicopters, Inc. v. Carson Helicopters, Inc.* No. 08-6415-AA, 2009 WL 2153029 (D. Or. July

16, 2009). This obligation arose from a Repair/Overhaul Services Agreement under which

Columbia agreed to perform repair and maintenance services for Carson's helicopters. (Pls.'

Second Am. Compl. (#144) ¶ 4.) Judge Aiken's grant of summary judgment required Carson to

defend Columbia in the pending wrongful death and personal injury lawsuits. *Columbia*

*Helicopters*, 2009 WL 2153029, at *4.

Following Judge Aiken's ruling, Carson filed its First Amended Complaint (#39), then a

Second Amended Complaint (#144), against Houston Casualty in this court, adding several

claims regarding Endorsement 3 of the Carson–Houston Casualty policy. Endorsement 3

"extends coverage for covered risks to entities with whom Carson has entered into contractual

arrangements in the course of its aviation operations." (Pls.' Second Am. Compl. (#144) ¶ 5.)

Carson asserts that Houston Casualty's obligation to defend Carson[1] extends to Columbia through

Endorsement 3, given Judge Aiken's ruling. Carson alleges breach of contract regarding Houston

---

[1] Coverage C of the policy requires Houston Casualty to defend Carson in the bodily
injury and wrongful death actions, which Houston Casualty accepted.

Casualty's failure to accept defense of Columbia, seeks a declaratory judgment that Houston Casualty is obligated to defend Columbia, and asserts a bad faith claim against Houston Casualty for its refusal to defend Columbia. (*Id.* at ¶¶ 43-58.)

The disputed threshold issue in this coverage action is which state's laws apply to Carson's contractual claims and its claim for bad faith denial of coverage. Several related issues also arose in the briefing, as discussed below.

## DISCUSSION

## I.    <u>Standard of Review</u>

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2). When "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted). For cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (quoting *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003)).

## II.    <u>Choice of law</u>

These cross-motions for partial summary judgment identify several potential conflicts of law. The parties primarily discuss the insurance policy interpretation principles employed by Oregon and Pennsylvania courts. They also point to differences in the way each state addresses retention of independent counsel as well as allegations of a bad faith denial of contract benefits.

Houston Casualty argues that law of the case applies, given the transfer from the Eastern District of Pennsylvania. Finally, both parties spend considerable time arguing that the significant contacts between a claim and a state warrant application of that state's law, assuming a substantive conflict exists.

To begin, both parties agree that the choice-of-law analysis is issue-specific. (*See* Def.'s Mem. in Supp. (#194) 8-9; Pls.' Am. Mem. in Supp. & Resp. (#278) 7-8.) I agree, and I address the tort (bad faith denial of contract benefits) and contract (insurance policy interpretation) issues separately. Houston Casualty agrees that Pennsylvania choice-of-law rules apply to the Endorsement 8 issue because it was raised prior to the § 1404(a) transfer. It then argues, however, without any helpful authority, that Oregon choice-of-law rules apply to the Endorsement 3 and bad faith claims not present before the Eastern District of Pennsylvania at the time of transfer. (Def.'s Mem. in Supp. (#194) 8.) Houston Casualty does agree, however, that Oregon and Pennsylvania utilize "substantially similar" choice-of-law rules, which come from the Restatement (Second) Conflict of Laws. (Def.'s Mem. in Supp. (#194) 9 n.1 (quoting the Restatement's standard for evaluating which state has the "most significant relationship" to the insurance policy and the parties).) Carson also agrees that both states' choice-of-law rules reach identical results, though it obviously has a different opinion as to the result. (*See* Pls.' Am. Mem. in Supp. & Resp. (#278) 8-10.) Throughout the briefing, both parties cite to Oregon and Pennsylvania cases to analyze the choice-of-law issue. I accept the cases cited by the parties as instructive, but I look primarily to the choice-of-law rules applicable in the Pennsylvania transferor court, not just to the Endorsement 8 issue that predates the transfer, but to all of plaintiffs' claims. *See Muldoon v. Tropitone Furniture Co.*, 1 F.3d 964, 965-66 (9th Cir. 1993)

(citing *Van Dusen v. Barrack*, 376 U.S. 612 (1964); *Ferens v. John Deere Co.*, 494 U.S. 516

(1990)) (finding that whether the transferor court grants a 1404(a) transfer sua sponte, at the

defendant's request, or at the plaintiff's urging, "the transferee court must follow the choice of law

rules of the transferor court.") Application of Pennsylvania's choice-of-law rules, particularly to

plaintiffs' claims, supports the policy rationale articulated in *Ferens* and *Van Dusen*, giving at

least initial weight to plaintiffs' chosen forum.

A.      *Pennsylvania Choice-of-law Rules*

Pennsylvania courts utilize a flexible "significant contact and interest analysis" to

determine which of two jurisdictions' laws apply when a conflict arises in a tort or contract case.

*See Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805 (Pa. 1964) (abandoning the "strict lex

loci delicti rule . . . in favor of a more flexible rule which permits analysis of the policies and

interests underlying the particular issue before the court"); *Budtel Assocs., LP v. Continental Cas.

Co.*, 915 A.2d 640, 644 (Pa. Super. Ct. 2006) (extending "the *Griffith* rule" in "the contract law

context"). A court must initially "determine whether a conflict exists between the laws of the

competing states." *Budtel*, 915 A.2d at 643 (citing *Wilson v. Transp. Ins. Co.*, 889 A.2d 563, 570

(Pa. Super. Ct. 2005)). The court need not analyze further if no conflict exists. *Id.* If, however, a

conflict is found, the court must "determine[] which state has the greater interest in the

application of its law." *Id.* This interest analysis "requires a further determination as to which

state had the most significant contacts or relationships with the insurance contract." *Id.*

Pennsylvania's modern choice-of-law rules place significance on the policies underlying

each jurisdiction's laws. *See Griffith*, 203 A.2d at 802-03, 805; *Wilson*, 889 A.2d at 571; *see also

Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 227 (3d Cir. 2007) ("Under this new approach,

Pennsylvania courts are to apply the law of the forum with the 'most interest in the problem,' rather than the law of the place of injury.") (quoting *Griffith*, 203 A.2d at 806). As part of this approach, courts often differentiate between "true" and "false" conflicts of law. This dichotomy has resulted in some inconsistency, or at least two different concepts, among courts interpreting Pennsylvania law. For example, "[a] false conflict exists where the application of either state's law renders the same result, . . . or where only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law." *Youtie v. Macy's Retail Holding, Inc.*, 626 F. Supp. 2d 511, 520 n.7 (E.D. Pa. 2009) (citing *LeJeune v. Bliss-Salem, Inc.*, 85 F.3d 1069, 1071 (3d Cir. 1996); *Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.*, 94 F. Supp. 2d 589, 594 (E.D. Pa. 1999)) (internal quotations omitted).

The Third Circuit recently explored the two concepts of false conflict as developed in Pennsylvania state and federal cases, and concluded that "[w]e think it is incorrect to use the term 'false conflict' to describe the situation where the laws of two states do not differ. If two jurisdictions' laws are the same, then there is no *conflict* at all, and a choice of law analysis is unnecessary." *Hammersmith*, 480 F.3d at 230. Therefore, the court decided, the first part of a Pennsylvania choice-of-law analysis merely determines whether the two states would treat the issue differently under their substantive laws. *Id.* Only if relevant differences exist between the states' laws should the court "examine the governmental policies underlying each law, and classify the conflict as a 'true,' 'false,' or an 'unprovided-for' situation." *Id.* The issue of a true or false conflict, however, "should be treated as a threshold matter" under Pennsylvania law. *Id.* at 230 n.10. A "deeper choice-of-law analysis" is required "only if *both* jurisdictions' interests would be impaired by the application of the other's laws (i.e., there is a true conflict)." *Id.* at 230

(internal alteration omitted).[2]

### B.    *Conflicting Substantive Law*

The parties identify three areas of substantive law where the difference in application of

Oregon or Pennsylvania law may lead to different results. Under Pennsylvania's choice-of-law

rules, I begin by determining whether the substantive laws actually conflict.

When interpreting state law, district courts are bound by a decision from the highest state

court. *In re Kirkland*, 915 F.2d 1236, 1238-39 (9th Cir. 1990). In the absence of such a decision,

the federal court must predict how the state supreme court would decide the issue, using

appellate court decisions as instructive. *Id.* "[I]n the absence of convincing evidence that the

highest court of the state would decide differently, . . . a federal court is obligated to follow the

decisions of the state's intermediate courts." *Id.* at 1239 (quoting *Am. Triticale, Inc. v. Nytco*

*Servs., Inc.*, 664 F.2d 1136, 1143 (9th Cir. 1981)).

### 1.    **Insurance Policy Interpretation**

Interestingly, both parties argue that *no* conflict exists regarding Oregon and Pennsylvania

courts' insurance policy interpretation practices with respect to extrinsic evidence—they simply

---

[2] Carson notes, and I agree, that Oregon law recognizes a similar concept. *See Stubbs v. Weathersby*, 869 P.2d 893, 898 (Or. Ct. App. 1994), *aff'd*, 892 P.2d 991 (Or. 1995) ("There is no choice of law issue if, in a particular factual context, the interests and policies of one state are involved and those of the other are not or are involved in only minor ways. It is only if both states have substantial interests in having their law applied that we would determine which has the most 'significant relationship.'") (quoting *Dabbs v. Silver Eagle Mfg. Co.*, 779 P.2d 1104 (Or. Ct. App. 1989)); *see also Pulido v. United Parcel Serv. Gen. Servs. Co.*, 31 F. Supp. 2d 809, 813 (D. Or. 1998) (finding that, under Oregon law, no choice-of-law issue exists if both states do not "have substantial interests in having their laws applied," in which case courts should apply "the law of the one state with substantial interests"); *Frosty v. Textron, Inc.*, 891 F. Supp. 551, 556 (D. Or. 1995).

disagree about the proper characterization of the law.[3] (*See* Def.'s Mem. in Supp. (#194) 11 (arguing that both Oregon and Pennsylvania allow extrinsic evidence); Pls.' Am. Mem. in Supp. & Resp. (#278) 17-18 (arguing that neither Oregon nor Pennsylvania allows extrinsic evidence).) In order to determine whether a conflict exists, I examine each state's laws regarding insurance policy interpretation. Because both parties appear to concede that extrinsic evidence is not admissible or necessary if the court finds the relevant provisions unambiguous on their face, I focus on whether the two states allow extrinsic evidence in order to resolve an ambiguity in a policy provision. (*See* Pls.' Am. Mem. in Supp. & Resp. (#278) 17-18; Def.'s Resp. & Reply (#288) 17-18.)

I note that, despite many motions and extensive briefing, this multi-district litigation has not yet required me to interpret any part of the Carson–Houston Casualty policy. Pending motions for partial summary judgment regarding Endorsement 3, and anticipated motions regarding Endorsement 8, will eventually require me to engage in such an interpretive analysis, but I offer no opinion or finding at this time about whether any ambiguity exists in the relevant provisions in this action.

a)      **Oregon's Methodology**

Houston Casualty argues that Oregon Supreme Court cases authorize the use of extrinsic evidence in insurance policy interpretation before resorting to the maxim of construction against

---

[3] Houston Casualty also argues that Pennsylvania's use of the "reasonable expectations" doctrine in policy interpretation creates a conflict of substantive law. (Def.'s Mem. in Supp. (#194) 10.) Carson, however, concedes that it "does not rely on this doctrine for coverage." (Pls.' Am. Mem. in Supp. & Resp. (#278) 23.) I agree with Houston Casualty that it may "renew this motion should Carson be permitted to change its position and assert the doctrine" and I will not analyze the potential conflict at this time. (*See* Def.'s Resp. & Reply (#288) 20.)

the drafter, citing *St. Paul Fire & Marine Insurance Co., Inc. v. McCormick & Baxter Creosoting Co.*, 923 P.2d 1200 (Or. 1996), *Hoffman Construction Co. of Alaska v. Fred S. James & Co., of Or.*, 836 P.2d 703 (Or. 1992), and *I-L Logging Co. v. Manufacturers & Wholesalers Indemnity Exchange*, 275 P.2d 226 (Or. 1954). (Def.'s Resp. & Reply (#288) 17-20.) Houston Casualty argues that the Oregon Court of Appeals' more recent line of cases, holding that courts should not consider extrinsic evidence when interpreting an insurance policy, is simply misguided, and the Oregon Supreme Court would disagree with such a holding. (*See* Def.'s Mem. in Supp. (#194) 11; Def.'s Resp. & Reply (#288) 19-20.)

Carson argues that the more recent appellate cases are not only consistent with Oregon Supreme Court cases, but notes that those cases cite *Hoffman* with authority in holding that courts should not consider extrinsic evidence to resolve an ambiguity. (Pls.' Am. Mem. in Supp. & Resp. (#278) 18-19; *see also Rhiner v. Red Shield Ins. Co.*, 208 P.3d 1043 (Or. Ct. App. 2009); *Employers Ins. of Wausau v. Tektronix, Inc.*, 156 P.3d 105 (Or. Ct. App. 2007); *Tualatin Valley Housing Partners v. Truck Ins. Exch.*, 144 P.3d 991 (Or. Ct. App. 2006); *Andres v. Am. Standard Ins. Co. of Wis.*, 134 P.3d 1061 (Or. Ct. App. 2006).)

### i.    Oregon Supreme Court Cases

The parties and the Oregon Court of Appeals cite *Hoffman* as the leading case on this issue. Even *St. Paul Fire*, the most recent case on point, cites heavily to *Hoffman* in describing the general rules of construction applicable to insurance policies.

> The interpretation of the terms of an insurance policy is a question of law. [*Hoffman*, 836 P.2d at 706.] In interpreting a policy, a court's goal is to ascertain the intent of the parties, based on the terms and conditions of the policy. *Ibid.* Ambiguous terms in an insurance policy are "construed against the insurer, who drafted the policy." [*Ibid.*]

PAGE 10 - OPINION AND ORDER

*St. Paul Fire*, 923 P.2d at 1205.

     *Hoffman*, and later, *St. Paul Fire*, explains that "[c]ompeting plausible interpretations" of a policy provision or term "establish an ambiguity that will require some interpretive act by the court." *Hoffman*, 836 P.2d at 706. "This triggers a series of analytical steps, any one of which may resolve the ambiguity." *Id.* If both plausible interpretations remain reasonable even after examination of, "among other things, the particular context in which that term is used in the policy and the broader context of the policy as a whole," then the ambiguity "justifies application of the rule of construction against the insurer." *Id.* The court immediately restated this threshold, noting that "when two or more competing, plausible interpretations prove to be reasonable after all other methods for resolving the dispute over the meaning of particular words fail," the court should construe the language against the drafter "because the ambiguity cannot be permitted to survive." *Id.* at 706-07.

     The primary dispute between Carson and Houston Casualty concerns these analytical steps or methods a court may use to resolve an ambiguity. Carson's position limits the court's analytical steps to consideration of the policy itself, while Houston Casualty argues that the court may consider extrinsic evidence as a method to resolve an ambiguity. Neither *St. Paul Fire* nor *Hoffman* precisely defines the outer boundary of these analytical steps (i.e., neither explicitly authorizes or bars extrinsic evidence), so I look to the court's actual analysis in each case for further guidance.

     In *Hoffman*, the court analyzed the parties' competing interpretations of "amount recoverable." 836 P.2d at 705. After noting the absence of a definition in the policy, *id.* at 706,

PAGE 11 - OPINION AND ORDER

the court next analyzed the reasonableness of the parties' interpretations in context—first, in the context of the relevant section, and second, "in the light of the policy as a whole." *Id.* at 707. The court found the "defendant's interpretation to be reasonable" in context of the section at issue, and "[w]hile (strictly speaking) the interpretive methodology that we have described does not require it, we also consider plaintiffs' suggested interpretation . . . in the light of the policy as a whole," which only reinforced the court's prior finding. *Id.*

The court then summarized its analytical approach in an eight-part conclusion: (1) the court determined that the term or phrase was "pivotal to resolution of [the] case"; (2) it found that the policy did not define the term, "so it must be construed by resort to various aids to interpretation of the parties' intent"; (3) it could not use the "first method of interpretation," plain meaning, because the term was "susceptible to more than one plausible interpretation"; (4) the court subjected each plausible interpretation "to scrutiny in light of the context . . . and in light of the other provisions of the policy," finding that the plaintiffs' interpretation was not reasonable; (5) it found that the defendant's interpretation was reasonable because it did not nullify other parts of the policy; (6) because the court found that only one interpretation was reasonable, it resolved the ambiguity on that basis; (7) the resolution of ambiguity made reliance on "the rule that ambiguities are construed against the insurer" inappropriate; (8) the court "construe[d] the policy in accordance with the only reasonable interpretation." *Id.* at 709. The court concluded by recognizing that courts in other jurisdictions had interpreted the same phrase and found it ambiguous, therefore construing against the insurer. *Id.* The court went on to distinguish each of those cases on which the plaintiffs relied. *Id.* Notably, the court did not rely on, or mention, extrinsic evidence as a general analytical tool or as relevant to the issues in that case.

PAGE 12 - OPINION AND ORDER

In *St. Paul Fire*, the court interpreted various terms, phrases, and provisions related to three types of policies at issue in that case. *See* 923 P.2d at 1209. In some instances, the court found that the clause or word at issue was unambiguous. *See, e.g.*, *id.* at 1210. When the parties presented two plausible interpretations, however, the court began its analysis by looking to the words of the policy itself. *See id.* at 1212 ("Our analysis begins with the wording of the policies."). When the words in the policy did not resolve the ambiguity, the court looked to the common or ordinary meaning of the term. *Id.* ("We conclude that the wording of the policies does not resolve the issue. We next consider the ordinary meaning of 'accident.'"). When the common definition remained "broad enough to cover the proposed definitions of both sides," the court looked to "prior cases from this court [to] provide guidance as to the meaning of [the term]." *Id.*

The court proceeded to this third analytical step, analyzing its own prior caselaw, for two of the terms in the case. In the first instance, prior caselaw resolved the otherwise ambiguous term "accident." *See id.* at 1213. In the second instance, the court's "prior case law and contemporaneous understandings of the phrase 'sudden and accidental' len[t] support" to one party's interpretation, but "[t]he policies themselves [did] not resolve the ambiguity." *Id.* at 1218. The court concluded that the provision at issue was ambiguous. *Id.* "Accordingly, we construe the policy against the drafter." *Id.* The analytical chain is interrupted, however, by the paragraph that falls between the finding that "[t]he policies themselves do not resolve the ambiguity" and the conclusion to construe the policy against the drafter. The court notes, almost as an aside, that

> [The parties] and numerous amici curiae point to two additional types of materials to support their competing interpretations of the pollution exclusion:  (1) case law from other jurisdictions, interpreting the same pollution exclusion; and (2)

PAGE 13 - OPINION AND ORDER

statements by representatives of the insurance industry to agencies in various states, concerning the meaning of the pollution exclusion. Assuming that those materials are relevant and admissible, they lend support to *both* sides' arguments . . . . Accordingly, they simply help to demonstrate that the exclusion is ambiguous.

*Id.*

Houston Casualty argues that this paragraph "discuss[es] the extrinsic evidence and state[s] that it might be admissible if relevant," which must mean extrinsic evidence is not categorically barred and proves that *Hoffman* created no such rule. (Def.'s Resp. & Reply (#288) 19-20.) Carson, however, points out that the court "did not rule on the admissibility of the extrinsic evidence offered, and did not evaluate the extrinsic evidence when making its determination that the language at issue was ambiguous." (Pls.' Am. Mem. in Supp. & Resp. (#278) 19.) I further note that the extrinsic evidence discussed, "statements by industry representatives," appears to address the ambiguity presented in the phrase "sudden and accidental," a key component of the pollution exclusion at issue. Unlike traditional parol evidence, or evidence regarding the negotiations or understanding of the *contracting parties*, these are statements by a *third party* regarding the ordinary meaning of the phrase at issue as understood in the industry. Utilizing such "extrinsic evidence" is more like looking at prior caselaw, interpretations from other jurisdictions, or course of dealing than looking to the communications between the contracting parties themselves. And, ultimately, the court did not use the third-party statements in its analysis.

Finally, Houston Casualty notes that both *Hoffman* and *St. Paul Fire* cite to *I-L Logging*, which quoted language from an insurance treatise instructing courts to consider "the apparent object or purpose of the insurance, . . . the context of the policy, the subject matter of the

PAGE 14 - OPINION AND ORDER

insurance, the situation of the parties, and the circumstances surrounding the making of the contract" when construing the word or phrase at issue. (*See* Def.'s Resp. & Reply (#288) 18-20; *see also I-L Logging*, 275 P.2d at 231 (quoting 13 Appleman, Insurance Law and Practice, 11, § 7383 (n.d.)).) Although not mentioned by Houston Casualty, *I-L Logging* also notes that "the contract must be considered as a whole, and, in some instances, resort may be had to extrinsic circumstances attending the execution of the agreement." *I-L Logging*, 275 P.2d at 231. The court does not, however, mention or analyze any such extrinsic circumstances in the opinion. In fact, the case primarily holds that even when a phrase is ambiguous, the court is not bound "to adopt the construction urged upon us by [the insured.]" *Id.* at 232. This is so even though, ultimately, "the provisions should be liberally construed in favor of the insured." *Id.* (holding that the court's own interpretation of the precise phrase at issue, established in a prior case, controlled even though it differed from plaintiff's proposed interpretation).

Taken together, the three Oregon Supreme Court cases fall short of supporting Houston Casualty's argument that "there exists an extensive body of case law, including authorities of the Oregon Supreme Court, that support reference to extrinsic evidence as an aid in insurance policy interpretation." (Def.'s Resp. & Reply (#288) 18.) None of these cases utilized extrinsic evidence, but rather found terms to be unambiguous, or resolved ambiguities based on the context of the policy provision or prior Oregon caselaw, or construed the provision against the drafter. Nor did they expressly authorize the use of extrinsic evidence. At best, *I-L Logging* and perhaps *St. Paul Fire* alluded to the idea that the court could reference some other evidence, though maybe only interpretations by other jurisdictions or evidence of course of dealing, but failed to explain how that information would affect the analysis. In comparison, an Oregon Supreme Court opinion

PAGE 15 - OPINION AND ORDER

issued just one year after *St. Paul Fire* and written by the same Justice specifically described "the second of three analytical steps that the court follows in interpreting [non-insurance] contracts" as "examin[ing] extrinsic evidence of the contracting parties' intent." *Yogman v. Parrott*, 937 P.2d 1019, 1022 (Or. 1997); *see also Andres*, 134 P.3d at 1063 (noting the difference between *Hoffman*, an insurance case, and *Yogman*, a traditional contract case, regarding extrinsic evidence). Notably, *Yogman* did not involve an insurance contract, and did not cite to any of the court's insurance cases such as *St. Paul Fire*, *Hoffman*, or *I-L Logging*. Accordingly, the court's insurance contract opinions support the idea that courts should not rely on extrinsic evidence, but should "ascertain the intent of the parties[] based on the *terms and conditions of the policy*." *St. Paul Fire*, 923 P.2d at 1205 (citing *Hoffman*, 836 P.2d at 706) (emphasis added).

### ii.    Oregon Court of Appeals Cases

Even if the Oregon Supreme Court decisions remain unclear, any hesitation dissipates upon review of the more recent Oregon Court of Appeals cases on point. *Rhiner*, *Tektronix*, *Tualatin Valley*, and *Andres* all find that "the interpretation of an insurance policy is a question of law that is confined to the four corners of the policy without regard to extrinsic evidence." *Rhiner*, 208 P.3d at 1045; *see also Tektronix*, 156 P.3d at 117; *Tualatin Valley* 144 P.3d at 993; *Andres*, 134 P.3d at 1063. There is no indication that this finding contravenes prior decisions by the Oregon Supreme Court, or that the court would decide the issue differently.

### b)    Pennsylvania's Methodology

The parties advance similar arguments regarding Pennsylvania law—Houston Casualty argues that Pennsylvania courts permit the use of extrinsic evidence to interpret an insurance policy, while Carson argues that Pennsylvania courts prohibit such evidence in insurance cases.

PAGE 16 - OPINION AND ORDER

(Def.'s Mem. in Supp. (#194) 11; Pls.' Am. Mem. in Supp. & Resp. (#278) 20-23.)

### i.    Pennsylvania Supreme Court Cases

The most recent case on point is *Prudential Property & Casualty Insurance Co. v. Sartno*, 903 A.2d 1170 (Pa. 2006). The parties in *Prudential Property* offered competing, "equally reasonable interpretations" of a disputed term or phrase as applied to that particular set of facts. 903 A.2d at 1174. The Pennsylvania Supreme Court looked to another jurisdiction's analysis of the same phrase in support of its conclusion that the phrase was ambiguous. Once the court determined that both readings of the phrase were reasonable, i.e., an ambiguity existed, then "[r]egardless of which one is 'right' or 'wrong,' the fact is that because each interpretation is reasonable, the exclusionary term is ambiguous, and we must construe it in favor of the insured." *Id.* at 1177. The *Prudential Property* analysis is perhaps even simpler than that used by the Oregon Supreme Court. The Pennsylvania Supreme Court did not specifically review the term in the context of the specific provision or the policy as a whole, although it did determine whether each party's interpretation remained reasonable as applied to the facts of the case, which necessarily included the specific insurance policy at issue. *See id.* at 1174, 1177. The court's holding—"*because* each interpretation is reasonable . . . we *must* construe it in favor of the insured"—seems to leave little room for introduction of extrinsic evidence, though it did not specifically address such evidence. *See id.* at 1177 (emphasis added).

While *Prudential Property* makes the Pennsylvania Supreme Court's stance on extrinsic evidence in insurance contract interpretation reasonably clear, the parties also discuss *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 469 A.2d 563 (Pa. 1983), each arguing that the case supports its position. (Def.'s Resp. & Reply (#288) 15; Pls.' Am. Mem. in Supp. &

Resp. (#278) 20-21; Pls.' Reply (#301) 14-15.)  *Standard Venetian* sets forth the "familiar and well settled" principles governing insurance contract interpretation, including: (1) "the task of interpreting a contract is generally performed by a court rather than by a jury"; (2) the court should "ascertain the intent of the parties as manifested by the language of the written instrument"; (3) if a policy provision is ambiguous, the court should construe the provision against the insurer; and (4) where the language is unambiguous, the court must "give effect to that language." 469 A.2d at 566.

The court went on to overrule the requirement that an insurer "pro[ve] that the insured was aware of the exclusion or limitation [in the policy] and that the effect thereof was explained to him[,]" even when the provision was unambiguous. *Id.* at 566-67 (rejecting this holding from *Hionis v. N. Mut. Ins. Co.*, 327 A.2d 363 (Pa. Super. Ct. 1974)). In rejecting the introduction of extrinsic evidence regarding an unambiguous provision, the *Standard Venetian* court stated:

> We believe that the burden imposed by *Hionis* fails to accord proper significance to the written contract, which has historically been the true test of parties' intentions. By focusing on what was and was not said at the time of contract formation rather than on the parties' writing, *Hionis* makes the question of the scope of insurance coverage in any given case depend upon how a factfinder resolves questions of credibility. Such a process, apart from the obvious uncertainty of its results, unnecessarily delays the resolution of controversy, adding only unwanted costs to the cost of procuring insurance.

*Id.* at 567. Because the policy in *Standard Venetian* was "plain and free of ambiguity," the court had to give effect to that unambiguous language without requiring the insurer to prove that the insured understood the provision. *Id.* at 566-67. While *Standard Venetian* did not expressly discuss whether a court may consider extrinsic evidence to discern an ambiguous provision, the court's well-settled principles suggest that it would disallow such an inquiry.

PAGE 18 - OPINION AND ORDER

Finally, similar to the situation in Oregon as described above, though much closer in time, the Pennsylvania Supreme Court issued an opinion just two days after *Prudential Property*, allowing parol evidence "to explain or clarify or resolve [an] ambiguity" in an assignment (not insurance) contract. *Ins. Adjustment Bureau v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006). Houston Casualty does not cite this case, but I note it because it lends support to the idea that Pennslyvania, like Oregon, treats insurance and non-insurance contract cases differently. *Insurance Adjustment* does not cite to *Prudential Property*, *Standard Venetian*, or any of the Pennsylvania Superior Court insurances cases discussed below.

### ii.    Pennsylvania Superior Court Cases

Houston Casualty relies on *Celley v. Mutual Benefit Health & Accident Ass'n*, 324 A.2d 430 (Pa. Super. Ct. 1974) in support of its argument that Pennsylvania courts allow extrinsic evidence in insurance contract cases. (Def.'s Resp. & Reply (#288) 16-17.) *Celley*, which pre-dates *Hionis*, found that courts may look to "extrinsic evidence of the purpose of the insurance, its subject matter, the situation of the parties, and the circumstances surrounding the making of the contract." 325 A.2d at 434 (citing *Kook v. Am. Sur. Co. of N.Y.*, 210 A.2d 633, 639 (N.J. Super. Ct. App. Div. 1965)). The court also approved of "evidence of prior and contemporaneous negotiations and understandings between [the parties]" in order to "prove the parties' interpretation." *Id.* at 435 (citing *Graybill v. Penn Twp. Mut. Fire Ins. Co.*, 32 A. 632 (Pa. 1895)).

Houston Casualty further cites *DiFabio v. Centaur Insurance Co.*, 531 A.2d 1141 (Pa. Super. Ct. 1987). *DiFabio* described the traditional rule that ambiguous insurance provisions are construed against the drafter, but also explained that "[i]f extrinsic evidence will aid in the resolution of ambiguities, the court must look to it" and reserve any issues of disputed material

fact for the fact finder. 531 A.2d at 1142-43. In support of the use of extrinsic evidence, *DiFabio* cites to non-insurance, general contract cases. *See id.* at 1143. Because the parties in *DiFabio* did not present any extrinsic evidence to the trial court, the superior court looked to the language of the provision, the context of the policy as a whole, the ordinary meaning of the disputed phrase, and prior caselaw from the Pennsylvania Supreme Court regarding the phrase before construing the provision against the drafter. *Id.* at 1143-44.

I concede that the analysis of extrinsic evidence under Pennsylvania law to resolve ambiguities in insurance policy cases suffers from discrepancies between the Pennsylvania Supreme Court and the Pennsylvania Superior Court. I also recognize I am not the first district judge to undertake this analysis. In fact, two opinions from the Western District of Pennsylvania reached opposite conclusions on this precise issue. Carson cites *Federal Insurance Co. v. Continental Casualty Co.*, No. 2:05-cv-305, 2006 WL 3386625 (W.D. Pa. Nov. 22, 2006), which determined "that Pennsylvania law distinguishes between insurance contracts and other types of contracts." 2006 WL 3386625, at *20. The court concluded that "*Prudential Property* makes it clear that an ambiguous exclusion appearing in an insurance contract must be construed in favor of the insured *irrespective of which proposed construction is right or wrong*," without resort to any extrinsic evidence. *Id.* (emphasis in original). On the other hand, although not cited by Houston Casualty, a different judge in the Western District of Pennsylvania reached the opposite conclusion in *Pellegrino Food Products Co. v. American Automobile Insurance Co.*, 655 F. Supp. 2d 569, 578 (W.D. Pa. 2008) ("respectfully disagree[ing]" with the analysis in *Federal Insurance Co.*, and finding instead that the "well established principle that parol evidence may be utilized to resolve an ambiguity" in non-insurance contracts also applies to insurance contracts).

While these two cases are not binding, they are, of course, persuasive authority to assist in my own analysis. As such, I am not persuaded by the reasoning in *Pellegrino*, which conflated insurance and non-insurance cases and also relied on a Third Circuit opinion that ultimately rested its reasoning on *Celley*, the 1974 Pennsylvania Superior Court case addressed above. I do, however, generally agree with the *Federal Insurance Co.* analysis.

Therefore, I find that extrinsic evidence to resolve an ambiguity in an insurance policy is likely inadmissible in Pennsylvania, given the reasonable clarity in the recent *Prudential Property* decision by the Pennsylvania Supreme Court and the analytical flaws in the other cases cited by Houston Casualty (e.g., relying on non-Pennsylvania law for support, or relying on non-insurance cases to state general contract principles). This finding is also supported by the language in *Standard Venetian* directing courts to utilize the language of the written contract to determine the parties' intent, rather than extrinsic evidence.

Accordingly, I find that no conflict exists between Oregon and Pennsylvania law regarding admissibility of extrinsic evidence to illuminate an ambiguity in an insurance policy. In order to aid the parties' further briefing and streamline the analysis of pending or upcoming disputes regarding interpretation of the Carson–Houston Casualty policy, I will follow the specific principles as described in the Oregon line of cases, with which this court has more experience. *See Henkel Corp. v. Hartford Accident & Indem. Co.*, 399 F. Supp. 2d 607, 611 (E.D. Pa. 2005) (finding that when the legal treatment of an issue is the same under two states' laws, the court should avoid further conflict-of-law analysis and "may rely on the law of either or both jurisdictions").

###### 2. Bad Faith Denial of Benefits

Carson alleges a tort claim for bad faith denial of contractual benefits under Pennsylvania law. (Second Am. Compl. (#144) ¶¶ 54-58; *see also* 42 Pa. Cons. Stat. Ann. § 8371.) Oregon law maintains no such bad faith cause of action, but permits an independent tort claim for outrageous conduct separate from the breach of contract. (Pls.' Am. Mem. in Supp. (#278) 1-2.) The parties agree that each state would decide this issue differently, and the choice-of-law determination is dispositive of Carson's bad faith claim. This claim encompasses a narrow set of circumstances, focusing on the relationship between Carson and Houston Casualty and whether Houston Casualty knowingly lacked a reasonable basis to deny Carson's coverage under Endorsement 3.

Carson preliminarily argues that the conflict between Oregon and Pennsylvania laws regarding bad faith denial of benefits is actually a false conflict "because Pennsylvania has a very strong governmental interest in protecting its domiciled policyholder . . . while Oregon has no interest in shielding a non-domiciled insurer . . . from the bad faith remedies available to Pennsylvania policyholders." (*Id.* at 2.) Houston Casualty, on the other hand, contends "the connection to Pennsylvania is so tenuous that application of Pennsylvania law to the purported bad faith claim would be arbitrary and hence violate [Houston Casualty's constitutional] due process rights." (Def.'s Mem. in Supp. (#194) 17.)

Despite Houston Casualty's assertion, Pennsylvania's governmental interest is apparent in these circumstances—the primary named insured on the Carson–Houston Casualty contract is a Pennsylvania resident. (Pls.' Concise Statement of Facts (#270) ¶¶ 1, 8.) Pennsylvania courts recognize the "legislature was concerned about protecting its own residents/insured from overreaching insurance companies" when it enacted the bad faith statute. *Kilmer v. Conn. Indem.*

*Co.*, 189 F. Supp. 2d 237, 246-47 (M.D. Pa. 2002) (quoting *Celebre v. Windsor-Mount Joy Mut.*

*Ins. Co.*, No. CIV. A. 93-5212, 1994 WL 13840, at *2 (E.D. Pa. Jan. 14, 1994) (recognizing that

the bad faith statute "was likely designed in part to deter insurance companies from taking

advantage of insureds. . . . [but] the more likely policy . . . is that the Pennsylvania legislature

was concerned about protecting its own residents/insureds.")); *see also Thompson v. Prudential*

*Prop. & Cas. Ins. Co.*, Civ. A. No. 91-4073, 1992 WL 38132, at *4 (E.D. Pa. Feb. 20, 1992).

Even Houston Casualty notes that "[i]t has been repeatedly recognized in the Third Circuit that, 'a

state has a significant interest in prescribing the standards that will govern the insurance contracts

purchased by its residents.'" (Def.'s Resp. & Reply (#288) 7 (quoting *Melville v. Am. Home*

*Assurance Co.*, 584 F.2d 1306, 1313-14 (3d Cir. 1978)).) While the tort law governing a bad

faith claim is different than the contract standards governing insurance contracts, I agree that a

state has significant interest in laws protecting its residents.

     Houston Casualty argues that Oregon has a strong governmental interest in the bad faith

claim, but then provides examples of Oregon's connection to the underlying contract

itself—"[t]he Houston Policy was issued under the regulations of Oregon," "the . . . policy is

controlled under Oregon law," "HCC is not a licensed admitted insurer in Pennsylvania and

Carson's broker is not licensed as a surplus lines broker under Pennsylvania law." (Def.'s Resp. &

Reply (#288) 8.) These statements all relate to Houston Casualty's argument that Oregon has

significant contacts with the *policy* itself and therefore Oregon law should apply to interpretation

of the policy, but the statements offer no theory under which I should find that Oregon has a

governmental interest impaired by application of Pennsylvania's bad faith tort law.

     More directly to the point at issue, Houston Casualty only offers a general statement that:

PAGE 23 - OPINION AND ORDER

> It is worth noting that a "state's interest in enforcing its tort law is not constrained to protecting its residents from harm or suit." *See LeJeune v. Bliss-Salem, Inc.*[,] 85 F.3d 1069, 1072 [(3d Cir. 1996)]. "A state could have a host of reasons for limiting liability, including encouraging economic activity in the state . . . , and lowering costs to consumers . . . ." *Id.*

(Def.'s Resp. & Reply (#288) 8.) Houston Casualty does not provide authority, or even specifically argue, that these were actually Oregon's interests in declining to adopt a bad faith tort claim for denial of contract benefits. Even so, the interests noted by Houston Casualty would likely relate to Oregon's interest in protecting *resident* insurers from liability or encouraging insurers to make their principal place of business in *Oregon* through economic incentives. Even the broadest notion of lowering costs to consumers does not create a strong governmental interest in this case, as the market affected is likely the market of insurers selling directly in Oregon to resident insureds. Houston Casualty, however, is domiciled in Texas, with its principal place of business in Houston, Texas. (Pls.' Concise Statement of Facts (#270) ¶ 10.) It is not licensed to sell insurance directly in Oregon, but sells surplus lines insurance in multiple states, including Oregon and Pennsylvania. (*Id.* at ¶ 11.) In response to Carson's argument that Oregon has no governmental interest in protecting Houston Casualty from application of Pennsylvania's bad faith law, Houston Casualty distinguishes the facts of Pennsylvania and Oregon cases relied upon by Carson but fails to identify a relevant governmental interest that supports its argument. (Def.'s Resp. & Reply (#288) 8-10).)

I also recognize the secondary named-insured under the policy, Carson Services, a subsidiary of Carson Helicopter, is an Oregon resident. Houston Casualty makes no argument, however, nor can I imagine one, that Oregon has a governmental interest in protecting a nonresident insurer (Houston Casualty) from a bad faith claim simply because the nonresident

insurer sold a policy to a secondary-named insured who resides in Oregon. I do not find that Carson Services's Oregon residency creates a governmental interest—either preventing a resident's tort claim against a nonresident insurer or supporting a nonresident insurer's avoidance of a resident's tort claim—that "would be impaired by the application of [Pennsylvania]'s law." *See Youtie*, 626 F. Supp. 2d at 520 n.7. I admit this analysis would be different if Houston Casualty was an Oregon resident claiming the protection of its home state's laws. But the facts of this case lead me to conclude that Oregon does not have much, if any, interest in application of its own law on this issue, which would benefit a nonresident to the detriment of a resident. Therefore, I find that a "deeper choice-of-law analysis" weighing the contacts with Oregon and Pennsylvania is not necessary because any interest Oregon may have will not "be impaired by the application of [Pennsylvania's bad faith] law[]." *See Hammersmith*, 480 F.3d at 229. I allow Carson to assert its bad faith claim under Pennsylvania law.

### 3.    Retention of Independent Counsel

Houston Casualty initially argues that Oregon and Pennsylvania law differ "regarding any obligation for an insurer to employ 'independent' counsel[,]" but fails to include any factual reference to a dispute between these parties. (Def.'s Mem. in Supp. (#194) 11.) In response to Carson's assertion that it "has not requested that it be permitted to retain independent counsel to defend against the underlying accident lawsuits[,]" Houston Casualty notes that "Carson has recently requested that Houston pay the defense costs of its independent counsel in the underlying action." (*See* Pls.' Am. Mem. in Supp. & Resp. (#278) 25; Def.'s Resp. & Reply (#288) 20.) Finally, Carson notes that it "recently requested reimbursement for its payments to independent counsel in the underlying action" but "Houston Casualty has not even responded to

Carson's demand as of the date of this brief." (Pls.' Reply (#301) 17.)

I remain unclear about the parties' dispute regarding independent counsel. Without further information from the parties, I cannot determine whether an actual controversy exists about the retention of independent counsel. Until a controversy exists and the parties present more information to the court, I decline to analyze the alleged differences in Oregon and Pennsylvania law regarding payment to independent counsel.

## IV.    Law of the Case

Finally, Houston Casualty argues that law of the case counsels application of Oregon law as "applied to the interpretation of the insurance policy at least with respect to Endorsement 8 which was the subject of the coverage action at the time" Judge Shapiro transferred this case from the Eastern District of Pennsylvania. (Def.'s Mem. in Supp. (#194) 15; *see also Carson Helicopters*, 2009 WL 1688472.)

I decline to address Houston Casualty's request given my earlier finding that no conflict exists between Oregon and Pennsylvania law regarding interpretation of insurance contracts. *See supra* Part II, Section B.1. I already held that I will use the insurance contract interpretation standards set forth in Oregon cases for any interpretation analysis of the Carson–Houston Casualty policy.

## CONCLUSION

For the reasons given above, I GRANT IN PART AND DENY IN PART each party's Motion for Partial Summary Judgment (#193, 268). Because no actual conflict exists between Oregon and Pennsylvania law regarding insurance policy interpretation, I will follow the principles set forth in Oregon caselaw and refrain from considering extrinsic evidence to interpret

the Carson–Houston Casualty policy at issue in this coverage action. Houston Casualty's law of

the case argument is moot in light of the finding that no conflict exists. I will apply Pennsylvania

law to Carson's tort claim for bad faith denial of benefits because Pennsylvania has a substantial

governmental interest in application of its law but Oregon does not. I decline to address the issue

of independent counsel until the parties can demonstrate an actual controversy.


IT IS SO ORDERED.

DATED this   18th   day of May, 2010.


                                            /s/ Michael W. Mosman
                                            MICHAEL W. MOSMAN
                                            United States District Judge