IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

In re: Helicopter Crash Near                    Civil No.: 3:09-md-2053-MO
Weaverville, California 8/5/08                   Associated Matter: 3:09-cv-00705-MO

                                                OPINION AND ORDER

**MOSMAN, J.,**

## INTRODUCTION

This case arises out of a helicopter crash on August 5, 2008, near Weaverville, California

(the "Accident"). The helicopter was owned by Carson Helicopter, Inc. and Carson Helicopter

Services, Inc. (collectively "Carson") and supplied to the United States Forest Service ("USFS")

under a contract. A variety of cases alleging bodily injury and wrongful death have been filed

against Carson because of the Accident. Carson has turned to its insurer, Houston Casualty

Company ("HCC") for coverage. Houston has denied the extent of the coverage sought by

Carson. As a result, various coverage issues are before this Court.

PAGE 1 - OPINION AND ORDER

This round of motions concerns two aspects of the insurance contract between HCC and Carson (the "Policy"): Endorsement 3 and Endorsement 8. Oral Argument was held on both issues on September 24, 2010. On that date, I interpreted Endorsement 3 in Carson's favor, holding that Endorsement 3 provides coverage for the defense and indemnity obligations that Carson owes to Columbia Helicopters, Inc. in the underlying Accident lawsuits. The precise amount involved was the subject of post-hearing briefing. Endorsement 8 covers Aviation Products-Completed Operations liability, and has a $25 million limit of liability per occurrence. If Endorsement 8 does not provide coverage for the Accident, the parties agree that coverage in most cases is found under Endorsement 37, which limits liability to $200,000 per passenger.

While I ruled from the bench on Endorsement 3, I took the analysis of Endorsement 8 under advisement. For the reasons that follow, I hold that Endorsement 8 does not provide coverage for the Accident.

## GENERAL METHOD OF ANALYSIS FOR INSURANCE CONTRACTS

The parties are before me on cross-motions for summary judgment. A court should grant summary judgment "if the pleadings, the discovery and the disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party bears the initial burden of setting out the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the opposing party must set forth specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In considering summary judgment, the Court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. On cross-motions for summary

judgment, this can be the intellectual equivalent of turning left onto a busy street: a constant looking left and right as the facts and inferences shift according to which motion is being examined. Here, fortunately, the parties agree that there are no disputes of fact relevant to these motions. Each simply contends that it is entitled to judgment as a matter of law on its preferred interpretation of the Policy.

In interpreting an insurance policy, the goal is to ascertain the intent of the parties, based on the terms and conditions of the policy. *St. Paul Fire & Marine Ins. Co. v. McCormick & Baxter Creosoting Co.*, 324 Or. 184, 923 P.2d 1200 (1996). Under Oregon law (which is functionally the same as Pennsylvania law on this subject) the policy is considered as a whole, with the text read in light of the rest of the policy. *N. Pac. Ins. Co. v. Hamilton*, 332 Or. 20 (2001). The first step in interpreting the terms of an insurance policy is to determine if the disputed terms have been defined in the policy itself. If, as here, there is no applicable policy definition, the court looks to the plain meaning of the term. *See Clinical Research Inst. of S. Or., PC v. Kemper Ins. Cos.*, 84 P.3d 147 (Or. App. 2004). Unless the term is susceptible to more than one plausible interpretation, its plain and ordinary meaning controls the interpretation of the policy. *Am. Hardware Ins. Grp. v. W. One Auto. Grp., Inc.*, 2 P.3d 413, 415-16 (Or. App. 2000).

An insurance policy provision is ambiguous if there is more than one plausible interpretation. But this is not quite as simple as just figuring out whether the bare language of the disputed provision is susceptible to more than one reasonable interpretation. The competing interpretations have to be subjected to scrutiny in light of the context and in light of the other provisions of the policy. *Hoffman Constr. Co. of Alaska v. Fred S. James & Co. of Or.*, 836 P.2d 703, 709 (Or. 1992). If, but only if, both interpretations remain plausible in light of the context of

PAGE 3 - OPINION AND ORDER

the provisions and the policy as a whole, then the term is ambiguous.  As one Oregon court has

explained, for a term to be ambiguous "it must be susceptible to at least two alternative

interpretations that remain plausible after having been examined in light of the particular context

in which the term is used in the policy and the broader context of the policy as a whole." *Schutt v.*

*Farmers Ins. Grp.*, 879 P.2d 1303 (Or. App. 1994). In general, when an insurance policy is

ambiguous it should be construed against the drafter and therefore in favor of coverage. *Red Lion*

*Hotels, Inc. v. Commonwealth Ins. Co. of Am.*, 33 P.3d 358, 361 (Or. App. 2001).  The court

does not evaluate the two plausible readings of the disputed provision to decide which is

stronger. *See, e.g., Konell Constr. and Demolition v. Valiant Ins. Co.*, No. CV03-412-MO, 2006

WL 1360956 (D. Or. May 15, 2006) ("In a popularity contest, Valiant's interpretation might win

most of the time. But this court's task, under governing law, is not to choose the better of two

interpretations. When a policy is reasonably susceptible to more than one interpretation . . . then

it should be construed against the drafter.")

## ANALYSIS

I.      **Background on Endorsement 8**

Endorsement 8 reads, in pertinent part, as follows:

Aviation Products-Completed Operations Liability

This Policy will pay on behalf of the Insured all sums which the Insured shall
become legally obligated to pay as damages because of bodily injury and property
damage caused by an occurrence and arising out of the Insured's aviation
operations and/or the possession, use, consumption or handling of any goods or
products manufactured, constructed, altered, repaired, serviced, treated, sold,
supplied or distributed by the Named Insured or its employees, and then only after
such goods or products have ceased to be in the possession or under the control of
the Insured.

PAGE 4 - OPINION AND ORDER

Limit of Liability

The limit of the Company's liability for Aviation Products-Completed Operations Liability is $25,000,000 each occurrence and in the annual aggregate.

As can be seen, Endorsement 8 takes something called Aviation Products-Completed Operations, and provides liability coverage for it in the amount of $25 million per occurrence. But it does so, at least as to good and products, only after they have "ceased to be in the possession or under the control of the Insured." There are three main disputes between the parties as to the meaning of Endorsement 8. First, as applied to aviation operations, does the limiting clause about possession or control apply at all? Second, does the limiting clause apply when Carson has ceased to be in possession *or* control, or does it apply only when Carson has ceased to have both possession *and* control? And third, what does it mean for Carson to cease to have control? Does Carson cease to have control when the USFS has overall "mission control" or "operational control" of the flight? I will analyze each in turn.

## II.    Endorsement 8's Application to Aviation Operations

After focusing an enormous amount of heat, if not light, on the meaning of the word "control" Carson advances a late-comer among its textual arguments that actually is the first one to jump out at the casual reader of Endorsement 8. It seems readily obvious that the final phrase "ceased to be in the possession or under the control of the Insured" modifies only the Insured's "possession, use, consumption or handling of [certain] goods or products." While the sentence is a long one, and not a model of clarity, the final phrase does not modify "the Insured's aviation operations." The distilled structure looks something like this: (1) the Policy will pay damages for bodily injury or property damage, (2) caused by an occurrence, (3) arising out of the Insured's

aviation operations, or (4) arising out of the Insured's possession, use, etc. of certain goods or products, but only if (5) the goods or products have ceased to be in the possession or under the control of the Insured.

At least one court has interpreted this same contractual language in this same way. In *Benahmed v. HCC Insurance Holding, Inc.*, 210 WL 2926002 (N.D. Ohio July 23, 2010),[1] the court reasoned as follows:

> HCC also asserts that Endorsement Four [the same language as Endorsement 8] would only apply "after such goods or products have ceased to be in the possession or control of [the Insured]. This argument misreads the disjunctive "and/or." The endorsement language clearly includes two sources of damages: aviation operations, a defined term, and goods or products leaving the possession of an "Insured." The definition of "aviation operations" makes no mention of "such goods or products," and thus the clause restricting coverage until "after such goods or products have ceased to be in the possession or control of the Insured" cannot logically apply to that source of coverage.

I agree. But, contrary to Carson's argument, that does not end the analysis. The above reading of Endorsement 8 is plausible simply as a reading of the bare text. That may have been sufficient under Ohio law. But under Oregon law, I am obligated to determine whether it retains its plausibility in the context of this particular policy. Even if a particular phrase has only one initial meaning, it is still subject to question if that meaning runs afoul of the plain meaning of another part of the policy. This is basic insurance contract hermeneutics.

There are two main obstacles to contextual plausibility for what I will call the *Benahmed* interpretation. First, the effect is inconsistent with other important policy provisions. The *Benahmed* interpretation essentially provides $25 million of liability coverage for aviation

---

[1] HCC complains that Carson has raised this issue late in the game, in what is effectively its Reply. But it is obvious from the date of the decision that, at least in reliance on this opinion, it could not have been raised sooner.

operations. This is difficult to reconcile with Endorsement 37, which provides $200,000 bodily

injury coverage per passenger, and $25 million in bodily injury coverage for non-passengers/

crew, with a total combined limit of $25 million per occurrence.  When read this way,

Endorsement 8 essentially erases the per passenger limitation in Endorsement 37.

      Carson argues "unless the rider is irreconcilable with the printed clause, such clause must

stand." *Aetna Ins. Co. v. Sacramento-Stockton S.S. Co.*, 273 F. 55, 58 (9th Cir. 1921).  It then

notes that Endorsement 37, on its face, only amends the property damage and bodily injury

sublimits included in Coverages B and C of the Policy. Endorsement 37, it argues, makes no

reference to the separate limits of liability for completed operations contained in Endorsement 8,

and therefore should stand. This argument might have some strength if Endorsement 8 is viewed

as involving a different kind of coverage than Endorsement 37. If, for example, Endorsement 8

covers products or aviation activities that occur outside the control of Carson (such as a

helicopter that has been sold) and Endorsement 37 is intended to cover products and aviation

activities within the control of Carson, then the two clauses would not be irreconcilable. But the

*Benahmed* interpretation strips aviation operations from any "completed operations" context. It

provides a distinction for goods and products that have left Carson's possession or control, but

no such distinction for aviation operations. In doing so, it sets up an irreconcilable inconsistency

with Endorsement 37. This, by itself, is reason enough to view the *Benahmed* interpretation

implausible in the context of this contract. And the fact that Endorsement 37 was added to the

Policy later in time than Endorsement 8 increases the implausibility. Indeed, Carson seems to

recognize that in the face of a real inconsistency, the later provision of a policy is controlling.

Carson Mem. in Support of S.J. 16.

PAGE 7 - OPINION AND ORDER

The second obstacle to the plausibility of the *Benahmed* interpretation is closely related to the first. Endorsement 8 is captioned Aviation Products-Completed Operations. While the poor drafting makes it unclear precisely what is intended, it certainly seems directed at something *post*. As to goods and products, it is clearly attempting to cover only those that have moved on beyond Carson's possession or control. And in context, taking the caption to the endorsement into account, it seems to be attempting to do something similar with aviation operations, by limiting it to completed operations. While the meaning is not clear, it is implausible to read it as providing aviation operations coverage that has no reference whatsoever to completed operations, as opposed to ongoing operations.

For these reasons, I reject the *Benahmed* interpretation of Endorsement 8 as an avenue for providing coverage under Endorsement 8 for aviation operations, unless those operations have been "completed." Of course, that interpretation leaves open coverage under Endorsement 8 for certain goods and products, which could include a helicopter like the one involved in the Accident. For that reason, I will continue the analysis of Endorsement 8 under the alternative theories advanced by the parties.[2]

## III.    When "or" Means "and"

The limiting language in the final clause of Endorsement 8 is written in the disjunctive. It provides coverage for certain goods or products, but only after they "have ceased to be in the possession *or* under the control of the Insured." HCC argues that this means coverage applies

_____

[2] HCC also argues that even if Endorsement 8 were read in this way to provide $25 million in coverage for aviation operations, the words "aviation operations" are defined in the contract in a way that would not apply to the Accident. Given the way this issue has been teed up, I find it unnecessary to resolve it today.

only when the helicopter had ceased to be under *either* the possession *or* the control of Carson. In other words, HCC puts on Carson the burden of meeting two independent obligations: showing that the helicopter had ceased to be in its possession, and also showing that it had ceased to be under its control. Carson argues that it need only show one or the other: that if the helicopter had ceased to be under its control, for example, that by itself is enough for Endorsement 8 to apply without reference to the issue of possession.

Despite the overblown language with which Carson mocks HCC's position, HCC's reading of the text is not only correct, but the only plausible reading. Carson is apparently blinded by its certainty that "or" can never mean "and." But it can. This is widely known. The most common situation is the one we have here, where the proposition involves a negative. If I say, "you have coverage if you are from Oregon or Washington," then being either from Oregon or Washington will do; the "or" is purely disjunctive. But if I say, "you have coverage, but only if you are not from Oregon or Washington," then being from either Oregon or Washington will disqualify, and if you want to show coverage, you must negate both. Here, quite plainly, the coverage of Endorsement 8 involves a negative. Carson must show that the good or product involved (i.e., the helicopter) was neither in the possession of, nor under the control of, Carson.

Once again, a singularly plausible reading of the text does not necessarily end the analysis. The reading still must make sense in context. Here, the issue is whether this reading of Endorsement 8 somehow renders the concept of possession superfluous. It does not. Admittedly, the two key words here—possession and control—have very similar meanings. *See, e.g.,* Webster's Ninth New Collegiate Dictionary, where possession is defined as "the act of having or taking into control." *See also* Ninth Circuit Manual of Model Criminal Instructions, No. 3.18 ("A

person has possession of something if the person knows of its presence and has physical control of it, or knows of its presence and has the power and intention to control it.") But it is certainly possible to have one and not the other. Here, for example, Carson's own theory is that the USFS controlled the helicopter without possessing it, and Carson possessed the helicopter without controlling it.

Carson has acknowledged that it had possession of the helicopter. Carson's Consolidated Memorandum in Opposition to HCC's Cross-Motion and in Reply at 12. For this reason, I find that Endorsement 8 does not apply to these undisputed facts.

## IV.    The Meaning of Control

Whether there is coverage under Endorsement 8 can rest entirely on the fact of Carson's possession of the helicopter. But because the parties have devoted so much argument to the issue of control, I deem it prudent to evaluate it. Was the helicopter under Carson's control, or was it under the control of the USFS? Recalling the interpretive method discussed above, I must first examine whether there are two competing and plausible interpretations of Endorsement 8 on this point. HCC simply asserts that control has, in normal parlance, a broad meaning that includes what Carson was doing here -- operating the aircraft. It asserts that the physical control involved in flying the helicopter, together with whatever residual authority the Carson pilot retained under the USFS contract, is sufficient to establish control. This is certainly a plausible reading of Endorsement 8.

Carson contends that the word "control" here has a more specific meaning. Relying in part on the USFS contract, it contends that control refers to "operational control" or "mission control." Defined this way, control is not found merely by flying the helicopter, particularly when

the flying is done under the operational control of USFS, which could delay, terminate or cancel a flight at any time.

Carson's definition of control is certainly plausible, as such. That is, it is certainly *a* plausible definition, and well-supported by various authorities. What Carson does not defend quite as well is that it is the *only* plausible reading of the word control. I do not mean to suggest here that Carson has to come up with a definition of the disputed term that is the only plausible definition. Quite the opposite. But for Carson's chosen definition to carry the day, the <u>only</u> meaning of control has to be mission or operational control. If Carson argued that control means, among other things, mission control, and those other things included physical control, then it would lose. So Carson necessarily is arguing that control, as used in Endorsement 8, can only mean mission or operational control.  And this is a much tougher row to hoe.

While Carson suggests several reasons why control might include the concept of mission or operational control, it has put forth no persuasive reason why it must be limited to that definition. Nor do any spring to mind on examination of the text. Endorsement 8 most naturally is read to state that if Carson has retained any significant control of the helicopter, as that word is normally defined, then coverage does not follow. And the word control is not normally defined to include only the concept of mission or operational control.

For this reason, I do not find that Carson has advanced a plausible reading of the text. HCC has proffered a plausible reading, one that gives "control" its normal customary meaning. HCC's interpretation holds up in context. For these reasons, HCC's interpretation controls.

PAGE 11 - OPINION AND ORDER

V.    **Amount of Coverage Under Endorsement 3**

The amount of coverage under Endorsement 3 is bound up in the issue of the policy limits under Endorsements 8 and 37 (among others).  The discussion above necessarily resolves the issues before the court  as to the amount of liability coverage under Endorsement 3. What remained pending after the last hearing was the amount HCC might owe in defense costs.

As an initial matter, HCC raises a distinction between a duty to defend and the payment of defense costs. I agree with what Carson accurately describes as the majority rule, that an insurance company's duty to defend transforms into a duty to pay defense costs of an independent counsel where the insured has a conflict of interest. HCC and Carson have obviously conflicting interests with Columbia, and with each other. Absent some showing of unreasonableness, HCC's duty here is to pay defense costs incurred by independent counsel.

There are three categories of claimants who have sued Carson/Columbia in these proceedings: (1) the firefighter plaintiffs; (2) USFS inspector pilot  Ramage; and (3) pilot and co-pilot Schwanenberg and Coultas. Carson has previously acknowledged, and I agree, that "the limits applicable to a claim brought derivatively under Endorsement 3 are the applicable limits of the substantive coverage part under which coverage is claimed." Carson's Consolidated Memorandum in Opposition to HCC's Cross-Motion and Reply in Support of Carson's Motion for Partial Summary Judgment Regarding Endorsement 3 (Dkt. #450) 7. That "substantive coverage part" as to defense costs is found in the Policy section titled "Defense, Settlement and Supplementary Payments." This puts HCC under a duty to defend until "the applicable limit of the Company's liability has been exhausted by the payment of judgments or settlements." That limit applies differently to the three categories mentioned above.

PAGE 12 - OPINION AND ORDER

As to the firefighter plaintiffs, both Carson and Columbia were named defendants. HCC is required to pay all of Columbia's costs of defending those suits, up through the point when Carson and Columbia reached agreements-in-principle to settle these suits. As a practical matter, this means that all of the defense costs in the firefighter suits against Carson and Columbia were incurred before any indemnity payment was made by HCC. The payment of these defense costs does not erode the indemnity limit; it is just that the payment of indemnity stops the meter from running any further on defense costs.

Plaintiff Ramage's lawsuit naming Carson and Columbia is still pending. HCC's obligation to pay Columbia's defense costs  continues until the time comes that HCC exhausts the indemnity limit by payment of a judgment or settlement.

The Schwanenberg and Coultas suits, which also name Columbia, are in a slightly different position. Carson disputes that the Service Agreement imposes a defense obligation on Carson for these claims because Columbia's claim for contractual liability is barred by the applicable workers' compensation laws. Of course, Carson also continues on appeal to dispute its obligations to Columbia in the other lawsuits; this is just a different theory than in the firefighter suits. Nevertheless, to the degree that Carson is liable to Columbia in these Schwanenberg and Coultas suits, HCC is obligated to pay defense costs via Endorsement 3. There are issues, not currently before the court, as to whether the indemnity limit is different for these two pilots, but the principle is the same: HCC is obligated to pay defense costs until the indemnity limit is reached.

PAGE 13 - OPINION AND ORDER

**CONCLUSION**

To the extent and for the reasons given above, HCC's motion for partial summary

judgment is granted.

IT IS SO ORDERED.

DATED this  18th  day of November, 2010.


/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge

PAGE 14 - OPINION AND ORDER